Action to recover the sum of $1,200, alleged to be (264) due by the defendants, as agents of the plaintiff, on account of a certain stock transaction.
In the year 1905 the plaintiff subscribed for sixty shares of the capital stock of the Vermont Mills, each share being of the par value of $100, on which he paid $1,200 in cash, and consequently owed $4,800. The plaintiff was an officer in the Vermont Mills, but desired to remove from Bessemer City, where the mills were located. He wished to sell out his interest in the stock, and requested S. J. Durham, one of the defendants in this case, who was treasurer of the mills, to make the sale for him, and Durham agreed to do so. S. J. Wilkins, the other defendant, had charge of the certificates of stock belonging to the plaintiff. The plaintiff authorized S. J. Wilkins to sell the stock for him, and S. J. Wilkins did sell it to one Coble. Wilkins, in payment for the stock, did not receive any money from Coble, but two notes, one for $500 and one for $400, on the Odell Mills. He further received an order for $300 on the Vermont, Southern, and Whetstone Mills, and another order for $300 to pay up the assessments due on the stock. After receiving these orders, he canceled the notes due by the plaintiff, and took the $500 and the $400 notes with the orders and presented them to S. J. Durham, who was the treasurer of the Vermont Mills. Durham asked for indulgence from Wilkins as to the payment, and Wilkins wrote to the plaintiff on 18 October, 1906, asking the plaintiff to make a draft of $1,200 on the Vermont Mills through the First National Bank at Gastonia at ten days sight, and stating that Durham had promised to pay the same. The plaintiff drew the draft, which was not paid at the end of ten days, because of the insolvent condition of the Vermont Mills, and Durham sent his individual note for $1,200, payable in sixty days, which the plaintiff accepted.
All three of the mills, together with the Odell Mills, failed shortly after the sending of the note, and their affairs were placed in the hands of a receiver. Durham failed, too, about the same time, inasmuch as he was interested in all of them. The plaintiff claims the right to recover $1,200 for the following reasons:
1. That defendants disobeyed his instructions, express or implied, and sold the stock on credit, whereas they should have (265) sold it for cash, and by reason of their conduct in the transaction they are liable to him for its value.
2. That they made false and fraudulent representations to him as to the manner in which they had disposed of the stock, and he was led to believe by them that they had received cash for the same.
3. That they fraudulently converted the stock or the proceeds of it, and are thereby liable to him for the value thereof. *Page 212 
Defendants denied their liability upon any of the said grounds, and averred that, on the contrary, they had acted, not only prudently, but wisely, as it turned out, and that plaintiff had been greatly benefited by what they had done in his behalf. The court, at the close of the testimony, overruled defendants' motion for a nonsuit, and instructed the jury to answer the first two issues "Yes" and the fourth issue "No," according to the agreement of the parties, and upon the evidence to answer the third and fifth issues "No" and the sixth issue "Yes; S. J. Durham, in the sum of $1,200, with interest from 17 November, 1906." The jury thereupon returned the following verdict:
1. Did the defendants, or either of them, agree with the plaintiff to sell for him his twelve shares of stock in the Vermont Mills, Incorporated, at the price of $1,200 and remit the same to him? Answer: Yes.
2. Did defendants, or either of them, under said agreement, sell plaintiff's twelve shares of stock in the Vermont Mills, Incorporated, at the price of $1,200? Answer: Yes.
3. Have the defendants or either of them received $1,200 on account of said twelve shares of stock? Answer: No.
4. Have the defendants, or either of them, remitted or paid to the plaintiff the sum of $1,200 on account of said twelve shares of stock? Answer: No.
5. Have the defendants, or either of them, and if so, which one, embezzled, converted, or fraudulently applied or misapplied the proceeds from the sale of the plaintiff's stock? Answer: No.
6. In what amount if any, are the defendants, or either of them, indebted to the plaintiff? Answer: Yes; S. J. Durham, in the sum of $1,200 and interest from 17 November, 1906.
Judgment was entered upon the verdict in favor of the defendants, (266) and plaintiff appealed.
The material issues seem to be the third and fifth. As to the third issue, all the evidence goes to show that Coble did not pay any money at all for this stock — that is, that the defendants did not receive any money from him; so there could be but one answer to this question. Coble was a witness for the plaintiff and testified that he had paid for the stock as stated above.
As to the fifth issue, it is specifically charged in the eleventh paragraph of the complaint that these defendants received $1,200 as the proceeds of the sale of the stock, and this fifth issue is directed to that paragraph in the complaint and the answer to it, denying the same. The proceeds were alleged to have been received in cash, and inasmuch as no money was received, it could not have been fraudulently appropriated or embezzled; but giving to the fifth issue its broadest meaning, *Page 213 
so that it will embody the question as to whether or not the defendants converted or fraudulently applied or misapplied any proceeds, whether money or not, realized from the sale of the plaintiff's stock, the defendants then contend that there was no evidence of such fraudulent conversion. The proceeds were two notes due by the Odell Mills and the orders set forth in the above statement of facts. These notes were carried to Durham, who was the treasurer of the mills, by Wilkins, and so were the orders, and Durham did not pay them, because the Vermont Mills did not have the money at that time with which to make the payment.
It is true that the sale, as contemplated by Osborne, the plaintiff, evidently was to be a cash transaction, and he undoubtedly thought so at the time, but Wilkins could not obtain the cash, and, as appears from the evidence, sold the stock in the manner which seemed to him best. There is no charge in the complaint, nor is there any issue with reference to such a charge, that Wilkins fraudulently disposed of the stock for his own benefit. The charge is that he, with the other defendant, converted, embezzled, or fraudulently applied the proceeds from the sale of the stock. There does not seem to be the slightest evidence that they made any such conversion or were guilty of any kind of fraudulent conduct.
The plaintiff, however, insists that he is entitled to a judgment (267) against Wilkins, as well as Durham, for the $1,200. He did recover a judgment against Durham for $1,200 on the note which Durham gave him for his stock. The defendant Wilkins sent the paper to the plaintiff for $1,200, but did not receive any $1,200, and he had due authority to sell for the plaintiff, and received what, at the time, he thought was worth $1,200 and presented the claims to the proper party in order to collect them. They turned out to be of no value. If the plaintiff should be entitled to recover anything from Winkins [Wilkins], it would be, at most, the value of his stock, that Wilkins disposed of for him; and from all the evidence, that turned out to be thoroughly worthless, as the Vermont Mills was at that time an insolvent institution. Neither one of these defendants realized a dollar in the transaction, and, as will appear by the entire evidence, were acting in the matter solely for the accommodation of the plaintiff.
The plaintiff was the gainer in the end, for he was indebted to the Vermont Mills in the sum of $4,800 for his unpaid subscription to the stock, and had it not been surrendered and canceled, the receiver could and would have obtained judgment against him to the full amount of the notes, for the benefit of the creditors of the Vermont Mills. By the transaction, these notes were canceled and the plaintiff ceased to be the debtor of the Vermont Mills, and Coble took his place and became responsible for the debt which plaintiff had owed for the stock. *Page 214 
Considering the whole case, we can find no evidence of any fraudulent conduct of the defendants in their dealings with the plaintiff's stock. The undisputed facts show that the defendants were not acting for themselves, with the view of benefiting by the transaction, but finding that they could not sell the stock for cash, and perhaps suspecting what subsequent events proved to be true, that the Vermont Mills were on the verge of insolvency, they did the best they could do to save the plaintiff, their principal, from the wreck, so that he would not suffer any pecuniary loss by the failure of the mills, and disposed of the stock to Coble. It was not very long before the wisdom of their course was justified by the real facts in the case. Durham came to the plaintiff's rescue, as far as he could do so, and gave his own note for the (268) $1,200, which the plaintiff accepted. Misfortune overtook the defendant Durham when the mills failed, as he was largely interested in them and lost heavily, and he was unable to pay the note. Plaintiff has a judgment against him for the debt, and that is all to which he is entitled, notwithstanding the allegations of fraud, which have not been established.
There is another reason why the plaintiff is not entitled to recover anything more than the judgment of the court allows him. In the first place, the fact that Durham and Wilkins, his agents, had notified the plaintiff to draw on the Vermont Mills for the $1,200, which he did, the nonpayment of the draft and the taking of Durham's note were all circumstances reasonably calculated to put a prudent man upon notice that the sale had not been made for cash and to stimulate inquiry. It is a fact established in the case that Durham and Wilkins did not sell for cash, and Durham virtually so stated in his letter to plaintiff of 17 November, 1906. But after the latter had become fully acquainted with the fact that the Vermont Mills was his debtor, he agreed to accept Durham's note and to prove his claim against the insolvent mills and thus to get payment for his stock. This is shown by his letters of 11, 12, and 16 February, 1907, to Durham. These letters, which speak for themselves, are as follows:
Letter of 11 February, Osborne to Durham:
"I was under the impression that I held no claims against the Vermont Mills, but as you say in your letter dated 4th inst., that I have a claim, since I hold a note against you, I have no objection to you taking said claim in your hands and collecting what you can and crediting same on your note. If you wish me to file a claim against the mills, please notify me, and I will do so at once, and collect what I can and credit same on your note."
Letter of 12 February, Durham to Osborne:
"Your letter received. On receipt of your special-delivery letter, I *Page 215 
certified and filed your claim as your attorney. I so understood your request. If the mill does not pay you in full, my note stands for the balance, as you state in your letter. Please let me know if I did as you wish in filing your claim." (269)
Letter of 16 February, Osborne to Durham:
"Replying to your letter of recent date, will say that it is satisfactory to me, your putting in the claim as you have. I hope things will come out O. K. in our favor."
In the letter of 16 February he requests Durham to advance him $75 or $100, which he will credit on his note. This part of the correspondence, with other facts and circumstances, shows a complete ratification, which, under the law, requires no new consideration. An act may be ratified by any words or conduct indicating an intention on the part of the person in question to adopt the act as his own. If ratification is made with knowledge of the facts, it invests principal and agent, as a rule, with the same rights and duties as if the transaction had been previously authorized, and when it takes place the agent is absolved from all responsibility on account of the unauthorized act or conduct, whether he exceeded or departed from his instructions, or was a mere volunteer. Tiffany on Agency, pp. 60, 86, and 87.
We will not again consider the fact that the stock was really valueless at the time it was sold to Coble. It was not only worthless, but its continued ownership would have subjected the plaintiff to a heavy loss, and even if the defendants violated instructions, he has lost nothing by their delinquency.
Our conclusion is that, in any view of the facts, the plaintiff was not entitled to recover any more than he did, and a substantial instruction of the court to this effect was correct.
No error.
(270)